IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAYMOND RICHARDSON, | § | |
| and OTHERS SIMILARLY SITUATED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL NO. 4:11-CV-00738 |
| | § | |
| WELLS FARGO BANK, N.A., | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S POST-HEARING BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR FLSA CONDITIONAL CERTIFICATION
AND CLASS NOTICE PURSUANT TO 29 U.S.C. § 216(B)**

Timothy M. Watson
700 Louisiana Street, Suite 3700
Houston, Texas 77002
(713) 225-2300 – Telephone
(713) 225-2340 – Facsimile
twatson@seyfarth.com

ATTORNEY-IN-CHARGE FOR DEFENDANT
WELLS FARGO BANK, N.A.

Esteban Shardonofsky
Kendra K. Paul
Rachel M. Hoffer
SEYFARTH SHAW LLP
700 Louisiana Street, Suite 3700
Houston, Texas 77002
(713) 225-2300 – Telephone
(713) 225-2340 – Facsimile

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

## TABLE OF CONTENTS

A.    The Consolidation of Two Individuals' Claims With This Case Does Not Support Conditional Certification. .......................................................... 1

B.    Plaintiffs Again Unfairly Cite Out-Of-Context Testimony From Wells Fargo's Payroll Manager..................................................................... 6

C.    Plaintiffs Ignore Wells Fargo's Numerous Official Documents Setting Forth Its Overtime Policy................................................................. 10

D.    Wells Fargo's Varied Use of Prepopulated Timecards Prior to 2010 Does Not  Support Conditional Certification. ............................................. 12

E.    The Call Center Cases Cited By Plaintiffs Do Not Support Conditional Certification Here. ................................................................... 15

CONCLUSION ............................................................................................................ 19

14100641v.5

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bishop v. AT&T Corp.*,
256 F.R.D. 503 (W.D. Pa. 2009) ........................................................................... 16, 19

*Blaney v. Mecklenburg Hosp. Auth.*,
No. 3:10-cv-592, 2011 U.S. Dist. LEXIS 105302 (W.D.N.C. Sept. 16, 2011) ............. 4

*Burch v. Qwest Communications Int'l, Inc.*,
500 F. Supp. 2d 1181 (D. Minn. 2007) ............................................................... 17, 19

*Burch v. Qwest Communications Int'l, Inc.*,
677 F. Supp. 2d 1101 (D. Minn. 2009) ...................................................................... 17

*Cadle Co. v. Whataburger of Alice, Inc.*,
174 F.3d 599 (5th Cir. 1999) ........................................................................................ 2

*Fisher v. Michigan Bell Telphone Co.*,
665 F. Supp. 2d 819 (E.D. Mich. 2009) ............................................................... 16, 17

*Fisher v. Rite Aid Corp. & Eckerd Corp.*,
No. RDB-09-1909, 2010 U.S. Dist. LEXIS 56383 (D. Md. June 8, 2010) ....... 3, 17, 19

*Frye v. Baptist Mem. Hosp., Inc.*,
No. 07-2708, 2011 U.S. Dist. LEXIS 45605 (W.D. Tenn. Apr. 27, 2011).................. 15

*Garrett v. Sitel Operating Corp.*,
No. 10-cv-2900-STA-cgc, 201 U.S. Dist. LEXIS 133846 (W.D. Tenn. Nov. 18,
2011).............................................................................................................................. 18

*Heaps v. Safelite Solutions, LLC*,
No. 2:10-CV-729, 2011 U.S. Dist. LEXIS 40089 (S.D. Ohio Apr. 5, 2010) ......... 17, 18

*Meyers v. GC Servs., L.P.*,
No. 3:09-1242, 2010 U.S. Dist. LEXIS 25764 (S.D.W. Va. Mar. 18, 2010) ................ 3

*Raniere v. Citigroup, Inc.*,
No. 11-Civ.-2448, 2011 U.S. Dist. LEXIS 135393 (S.D.N.Y. Nov. 22, 2011) ...... 4, 5, 6

*Russell v. Illinois Bell Tele. Co.*,
575 F. Supp. 2d 930 (N.D. Ill. 2008) .......................................................................... 18

ii

*See Barron v. Henry Cnty. Sch. Sys.*,
242 F. Supp. 2d 1096 (M.D. Ala. 2003) ........................................................................... 2

*Seever v. Carrols Corp.*,
528 F. Supp. 2d 159 (W.D.N.Y. 2007) ........................................................................ 15

*Sharpe v. APAC Customer Service*,
No. 09-cv-329-bbc, 2010 U.S. Dist. LEXIS 1671, at *6-9 (W.D. Wis. Jan. 11,
2010) ..................................................................................................................... 15, 16

*Thompson v. Speedway Superway SuperAmerica LLC*,
No. 08-1107 (PJS/RLE), 2008 U.S. Dist. LEXIS 115050 (D. Minn. Aug. 21,
2008) ......................................................................................................................... 19

*Tracy v. Dean Witter Reynolds, Inc.*,
185 F.R.D. 303 (D. Colo. 1998 ) ................................................................................. 15

*Williams v. Accredited Home Lenders, Inc.*,
No. 1:05-CV-1681-TWT, 2006 U.S. Dist. LEXIS 50653 (N.D. Ga. July 25,
2006) ........................................................................................................................... 6

## STATUTES

29 U.S.C. § 216(b) ........................................................................... 1, 3, 6, 12, 19

**DEFENDANT'S POST-HEARING BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION FOR FLSA CONDITIONAL CERTIFICATION
AND CLASS NOTICE PURSUANT TO 29 U.S.C. § 216(B)**

**A.     The Consolidation of Two Individuals' Claims With This Case Does Not
Support Conditional Certification.**

Plaintiffs erroneously contend that Wells Fargo's request to transfer and consolidate two other cases with this case under the "first-to-file" rule supports their motion for conditional certification.[1]   (Plaintiffs' Post-Hearing Brief In Support Of Plaintiffs' Motion For Conditional Certification And Class Notice Pursuant To 29 U.S.C. § 216(b) (hereinafter "Post-Hearing Brief"), Doc. No. 47, at 2-3.)   Yet the addition of two[2] additional individual plaintiffs' claims to this case has no material effect on the issue of whether conditional certification is appropriate.   It does not, as Plaintiffs allege, "in and of itself establish a sufficient factual nexus . . . to certify a nationwide collective action." (Post-Hearing Brief at 3.)   Rather, the only potential relevance of the transfer of those claims to this case is limited to the insignificant fact that two other individual Personal Bankers ("PBs"), out of a putative class of tens of thousands, claim they worked off the clock (even though there are only pleadings and no actual evidence in the record regarding these claims, such as declarations from these plaintiffs).

---

[1] Wells Fargo successfully moved to transfer and consolidate one FLSA case in California, the *Herrera* case.  Wells Fargo also moved to consolidate a Florida case, the *Mendez-Contreras* case, with this case on December 19, 2011.  The court in *Mendez-Contreras* has not yet ruled on the motion to transfer.  In any event, this motion is now moot because, as discussed below, the parties have reached a settlement and the case will be dismissed soon.

[2] Out of the two named plaintiffs in the *Herrera* case, only one of them worked for Wells Fargo as a Personal Banker.  Tania Herrera did not work as a Personal Banker but worked instead only as a "Customer Services Sales Representative."  *See Herrera* Complaint, Ex. A, ¶ 7.

14100641v.5

But these two additional claims, at best, show only two other alleged sporadic violations of Wells Fargo's overtime policy and in no way establish a nationwide policy or practice.  *See Barron v. Henry Cnty. Sch. Sys.*, 242 F. Supp. 2d 1096, 1104 (M.D. Ala. 2003) ("[T]he mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences." )  As the court in *Barron* noted:

> To conclude otherwise, that is, to conclude that it is enough to demonstrate that employees are similarly situated simply to say that they claim violations of the law by the same employer, would be to conclude that any time an employer had two or more employees who allegedly were not being paid the overtime they claimed they were due, the employees would be similarly situated and be allowed to proceed with a collective action.

*Barron.*, 242 F. Supp. 2d at 1104.  Further, this does nothing to diminish all of the arguments Wells Fargo asserted in its opposition to plaintiffs' motion.[3]

**Different standards govern consolidation and conditional certification.**  Wells Fargo moved to transfer the two cases because the complaints in those cases asserted allegations that overlap with those made by the Plaintiffs in this case.  Under the first-to-file rule, when this happens, transfer and consolidation is appropriate.  *See e.g.,  Cadle*

---

[3]  That is, the fact that two additional plaintiffs have sued does not diminish Wells Fargo's arguments that, in a very small nutshell:  (1) each plaintiff's claim will require a "mini-trial" because it is based on unique facts—specifically, whether his or her particular manager—one out of thousands—violated company policy and forced him/her to work off the clock, and if so, when, how, under what circumstances, etc.; (2) courts have declined to grant certification based on allegations from a microscopic fraction of the potential class (now ten individuals instead of eight), especially when those allegations are refuted by other objective or more credible evidence; and (3) Plaintiffs' evidence does not establish a nationwide unlawful practice by Wells Fargo.  *See* Defendant's Response In Opposition To Plaintiff's Motion For FLSA Conditional Certification And Class Notice Pursuant To 29 U.S.C. § 216(b) (Doc. No. 42) (hereinafter "Wells Fargo's Response").

*Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999).[4]  But beyond the fact that ten instead of eight Plaintiffs have sued, Wells Fargo's request to transfer is not relevant to the issue of conditional certification—*i.e.*, the fact that pleadings have overlapping allegations sufficient to warrant transfer and consolidation has no relevance to the question of whether Plaintiffs have met their burden under Section 216(b) of showing that they are similarly situated to each other and to members of the potential class.  Determining whether consolidation is appropriate requires a superficial analysis of the pleadings; but determining whether conditional certification is appropriate requires an analysis of the record developed in the case thus far.  Thus, the two standards are completely different, and the fact that claims are subject to consolidation has no bearing on the question of whether conditional certification is warranted.

**_Herrera_ raises different kinds of off-the-clock allegations.**  In granting Wells Fargo's motion to transfer and consolidate in the *Herrera* case, the court there concluded that the allegations in the complaint in *Herrera* overlap with the allegations in Plaintiffs' complaint in this case.  That is, the court found only that in both cases, PBs alleged they worked off the clock—nothing more.  Yet beyond this similarity in the pleadings, the specific allegations of the plaintiffs in both cases are different and accentuate the reasons why conditional certification is not warranted here.

---

[4] The first-to-file rule is particularly appropriate in the context of competing FLSA collective actions, which threaten to present overlapping classes, multiple attempts at certification and summary judgment in different courts, and potentially conflicting outcomes.  Thus federal courts consistently apply the first-to-file rule to overlapping FLSA collective actions.  *See, e.g., Fisher v. Rite Aid Corp. & Eckerd Corp.*, No. RDB-09-1909, 2010 U.S. Dist. LEXIS 56383, at *6-11 (D. Md. June 8, 2010); *Meyers v. GC Servs., L.P.*, No. 3:09-1242, 2010 U.S. Dist. LEXIS 25764, at *4-7 (S.D.W. Va. Mar. 18, 2010).

3

Among other things, the plaintiff in *Herrera* claims she is owed overtime because Wells Fargo: (1) "erases or modified [employees'] recorded hours, or requires them to modify their recorded hours on its electronic timekeeping system to eliminate or reduce hours worked, including hours in excess of eight per day and/or forty per work week;" and (2) because Wells Fargo "provides 'comp time' in lieu of paying overtime hours for hours worked in excess of eight per day and/or forty per work week."[5]  Yet none of the Plaintiffs in this case (either in their depositions or in the declarations) claim that their managers altered their timesheets or that they were given "comp. time" in lieu of overtime.  Thus, the *Herrera* plaintiff's allegations demonstrate that she is not similarly situated to the Plaintiffs in this case for purposes of conditional certification.[6]

**Plaintiffs mischaracterize the holding in *Raniere v. Citigroup, Inc.*  *Raniere*** is a misclassification case; the plaintiffs were home loan officers (their titles were "Home Lending Specialists" or "Loan Consultants") who alleged that they were "improperly classified as exempt from the provisions of the FLSA."  *Raniere v. Citigroup. Inc.*, No.

---

[5] *See* Herrera's Complaint, attached hereto as Exhibit A, ¶¶ 2, 22, 24.  Thus, for the *Herrera* plaintiffs, each plaintiff, for each alleged instance of off-the-clock work, will have to present evidence that he or she worked on a particular occasion and that his or her manager altered the time records for this occasion; or for their "comp time" allegations, that during any particular week, the plaintiff actually worked in excess of 40 hours and that at some subsequent time his or her manager gave the plaintiff "comp time" instead of overtime compensation.  As with plaintiffs' other allegations, such claims require highly individualized, fact intensive inquiries unique to each plaintiff.  Thus, because the "record before the court demonstrates that there is no common policy or scheme and instead individualized questions of fact predominate, the action is not an appropriate one for certification." *Blaney v. Mecklenburg Hosp. Auth.*, No. 3:10-cv-592, 2011 U.S. Dist. LEXIS 105302, at *34 (W.D.N.C. Sept. 16, 2011).

[6] Notably, despite the eight-plus months that passed between the filing of the *Herrera* lawsuit (on March 28, 2011) and the court's ruling to transfer and consolidate that case with this lawsuit (on December 9, 2011), no additional plaintiffs joined the *Herrera* case.  And as mentioned above, the parties have agreed to settle the *Mendez-Contreras* case.  *See* Plaintiff Mendez-Contreras' January 13, 2012 Notice of Settlement, attached hereto as Exhibit B.  As in *Herrera*, no additional plaintiffs joined the *Mendez-Contreras* case, which may explain the plaintiff's interest in a quick settlement.

4

11-Civ.-2448, 2011 U.S. Dist. LEXIS 135393 at *3-4 (S.D.N.Y. Nov. 22, 2011).  The court granted conditional certification because the court concluded that plaintiffs had presented substantial credible evidence that the loan officers' "primary [job] duty was [the non-exempt duty of] complet[ing] mortgage applications for customers . . . and that their duties in so doing were substantially similar." *Id*. at *17.[7]   In making that determination, the court **did not** consider the transfer/consolidation motion filed by the defendant, Citigroup ("Citi").  Indeed, the quote from that case cited by Plaintiffs is taken from another part of the court's opinion.  Thus, in deciding whether to grant conditional certification, the court did not believe Citi's motion to transfer was relevant.

After finding that conditional certification was warranted, the court then addressed the issue of how broadly notice should be distributed.  Having already decided that Citi's loan officers were similarly situated nationwide, the court rejected Citi's argument that notice should be sent only to Citi's branches where the plaintiffs worked.  *Id*. at *84-85. In doing so, the court observed that Citi's motion to transfer and consolidate another case with *Raniere* undermined its contention that notice should only be sent to the branches where the plaintiffs worked.  *Id*. at *85 ("This is particularly the case in light of Defendants' motion to dismiss, transfer, or a stay on the grounds that 'identical' claims have been made by a Loan Consultant in the Florida-based Corgosinno action.").

---

[7] Among other things, the court relied on the fact that shortly before the lawsuit, in July 2010, the defendant changed the loan officers' FLSA classification to non-exempt status and began paying them overtime.  *Raniere*, 2011 U.S. Dist. LEXIS 135393 at *70.

Thus, once the court determined that loan officers' job duties were the same across the country, the only question that remained was whether notice of the case should be sent to all loan officers across the country.  In that context, the court found that Citi's statement in its motion to transfer—that claims in another state (Florida) were "identical" to the claims in *Raniere*—supported distributing notice to Florida (and beyond) and not limiting notice to the branches where plaintiffs worked.  Hence, *Raniere* is not relevant here (in an off-the-clock case where similarity of job duties is not relevant)[8] since the Court has not found that substantial, credible evidence supports plaintiffs' claims that they are similarly situated to each other and to the tens of thousands of PBs they seek to represent.

## B. Plaintiffs Again Unfairly Cite Out-Of-Context Testimony From Wells Fargo's Payroll Manager.

Plaintiffs again mischaracterize and selectively quote the deposition of Teresa Swanson (Vice President of Payroll and Human Resources Data Services).  This time they do so in support of their contention that Wells Fargo "made no compliance efforts to ensure that personal bankers were paid for the time that they spent performing marketing

---

[8]  As one court observed:

The Plaintiffs … are alleging that Accredited's branch managers violated the company's established overtime and timekeeping policies by requiring loan officers to work "off-the-clock."  **Liability cannot be determined by considering the employee's job duties**.  Rather, every employee must testify about his awareness of the overtime policy, and his violation of that policy -- and whether it was compelled by his or her branch manager.  In other words, there must be a fact-specific, individualized inquiry into each Plaintiff's day-to-day activities … [Thus] the Plaintiffs, the opt-ins and the proposed class members are not sufficiently similarly situated for a nationwide collective action.

*Williams v. Accredited Home Lenders, Inc.*, No. 1:05-CV-1681-TWT, 2006 U.S. Dist. LEXIS 50653, at *13-14 (N.D. Ga. July 25, 2006) (emphasis added); *see also* Wells Fargo's Response at n. 21.

duties and being active in the community." (Post-Hearing Brief at 7-8.)   Yet this is demonstrably false.

According to Plaintiffs, Swanson could not "provide clarity" regarding whether Wells Fargo considered offsite marketing time to be compensable.  (Post-Hearing Brief at 7-8.)  Plaintiffs then support this assertion with quotations from Swanson's deposition as though she were designated to testify about that topic.  (*Id.* at 7.)  She was not; Tom DeBesse, a Lead District Manager in the Houston, was designated to testify about the compensability of PBs' activities,[9] and he was unequivocally clear at his deposition that offsite marketing activities are compensable.[10]

But instead of quoting (or even acknowledging) what DeBesse said on the subject, Plaintiffs quote Swanson, despite Swanson's repeated protestations at her deposition that she is not the right person to ask such questions; that she works in the payroll department; and that she deals only with the technical aspects of payroll.[11]   Undeterred, Plaintiffs' counsel pressed on:[12]

---

[9]   *See* DeBesse Dep., Ex. B-2 to Wells Fargo's Response, at 35:3-35:15 ("Q: Topic 13: Policies, procedures, practices, forms, methods used to track and record time for personal -- that personal bankers spent working. Are you prepared to testify on that topic? A: Yes. Q: But you are, as I understand it, not a person who would have knowledge concerning the computer records or the technical aspects of the Webtime system; is that correct? A: That is correct. Q: Excluding those technical things, though, you're prepared to testify on that topic? A: Yes.").

[10]   Plaintiffs simply ignore that DeBesse testified that it is Wells Fargo's policy that PBs should record and must be paid for any offsite marketing work done on behalf of Wells Fargo.  *See* DeBesse Dep., Ex. B-2 to Wells Fargo's Response, at 115:11-116:2 and 185:22-186:17.  Moreover, as Wells Fargo notes in its Response, the fact that marketing activities are listed along with other compensable job duties on the 86 job descriptions that Plaintiffs attached to their Motion for Conditional Certification indicates that Wells Fargo's policy is to pay for that work. *See* Wells Fargo's Response at 9.  Plaintiffs ignore this evidence and instead focus their efforts to misconstrue and selectively quote the deposition of Teresa Swanson.

[11]   Swanson Dep., Ex. B-1 to Wells Fargo's Response, at 61:20-62:12 ("Q:  Using that definition, are you able to testify regarding topic five? A: No. Q: Let's read topic five. It says (as read): "Wells Fargo's practices, policies, procedures, rules and guidelines for reporting, logging and/or recording personal bankers' work activities." A: Other than time worked, I couldn't talk about anything. Q: Okay. So then you're able to give testimony on topic five

Q.    What's a Job Spotlight?

A.    I have no idea.

Q.    Well, in looking at it, it appears to provide an overview of the job. Do you see that?

A.    Yeah, I see that.

Q.    I'd like to direct your attention if I could to the fourth bullet point. Could you read that for me, please?

A.    "Reaches out in community by visiting businesses, making outbound calls to customers, and being visible and active in community."

Q.    Is that time that should be paid through the timekeeping system at Wells Fargo?

A.    If they're working, they should be logging their time.

Q.    Objection, non-responsive. The job duties that are described in bullet four that you just read [out loud], is that time that should be paid for by Wells Fargo?

MR. WATSON:    Objection, calls for speculation.

THE WITNESS:    Yeah, I don't know because I don't know what they're asking them to do.

MS. WILLS:    Okay. Let's go through it. **"Reaching out in the community by visiting businesses." Okay. Is that time that they should be paid for?**

MR. WATSON:    Objection, calls for a legal conclusion. Calls for speculation.

THE WITNESS:    Yeah, I don't know what context, I don't know what they're doing.  <u>This is not anything we -- this isn't mine. I don't know anything about this.</u>

MS. WILLS:    Visiting businesses, "Reaching out in the community by visiting businesses."

MR. WATSON:    The same --

MS. WILLS:    Is that something that they should be paid for?

MR. WATSON:    The same objection, calls for a legal conclusion. Calls for speculation.

THE WITNESS:    We tell people to record all their working time.

MS. WILLS:    Objection, non-responsive.  Is that work that they should be paid for?

MR. WATSON:    Objection, asked and answered. You don't have to.

---

regarding time worked? A: <u>How they're supposed to log their time.</u> Q: So you are able to give testimony regarding how personal bankers are supposed to log their time; is that correct? A: Correct.")  (emphasis added).  *See also* Wells Fargo's Response at note 29 (quoting other relevant portions of Swanson's deposition testimony on this issue).

[12] Although the full quotations here are extensive, Wells Fargo believes they are necessary to accurately depict Swanson's testimony.

14100641v.5

THE WITNESS:   I can't answer it any different.

MS. WILLS:   Is that time that should be logged on a timesheet?

MR. WATSON:   The same objection.

THE WITNESS:   **I still can't answer it any different. I don't know if by reaching out in the community or visiting a business is going to Subway for lunch. I don't know what that means. I have no interpretation of that.  Any work  time should be logged.**

MS. WILLS:   **Well, how would an employee know whether or not that's time that they should log if you don't know?**

A.   **If we're called and asked, any time that they are working and that is deemed working time, they should be logging that. That would be our answer. All time worked should be logged.**

Q.   **So reaching out in the community by visiting businesses, that's time that should be paid?**

MR. WATSON:   Objection, calls for legal conclusion. Calls for speculation. Asked and answered.

THE WITNESS:   **If I knew what they meant when they wrote that, I could answer it; but since I don't know what they mean, I cannot answer that and give any kind of good answer for it.**

MS. WILLS:   So how would an employee know whether or not they should be paid or reaching out in a community by visiting businesses?

MR. WATSON:   Objection, argumentative. Calls for speculation. Calls for a legal conclusion.

THE WITNESS:   <u>Whoever provided that with them or their boss or -- I don't know. It's not corporate payroll.</u>

MS. WILLS:   So you don't know whether or not that's time that should be reflected on their timesheet?

MR. WATSON:   <u>I'm going to – this is getting repetitive and harassing. I'm going to ask you to please move -- to move on to a topic that's the subject of her expertise on which she's been designated to testify.</u>

MS. WILLS:   Well, this is one of the subjects, time recording.  Could you read back my question, please?  (The preceding question was read back.)

THE WITNESS:   Time worked should be reflected on their timesheet.

MS. WILLS:   **My question is, "Reaching out in the community by visiting businesses," time spent doing that, should that be reflected on the personal banker's timesheet?**

MR. WATSON:   Objection, calls for legal conclusion. Calls for speculation.

THE WITNESS:   **I can't answer that.**

14100641v.5

MS. WILLS:        **You don't know?**

        **A.**     **I do not know.**[13]

Swanson thus never testified that "it is uncertain whether personal bankers should in fact include time spent outside the bank marketing and reaching out into the community on their timesheets." (Post-Hearing Brief at 7.) To the contrary, she testified that "**If [PBs are] working, they should be logging their time.**"[14] Plaintiffs' repeated attempts to mischaracterize Swanson's testimony underscores the lack of evidence of any unlawful policy to deny compensation for offsite marketing activities—nationwide or otherwise.[15]

## C.    Plaintiffs Ignore Wells Fargo's Numerous Official Documents Setting Forth Its Overtime Policy.

Plaintiffs make the utterly unfounded, bald-faced assertion that Wells Fargo had "no training, policy or procedure in place to oversee whether personal bankers were recording these hours worked." (Post-Hearing Brief at 7.) Plaintiffs thus ignore the multiple contemporaneous policies and training guides Wells Fargo cited in its Response and summarized briefly below:

---

[13] Swanson Dep., Ex. B-1 to Response, at 188:7-192:23 (emphasis added).

[14] *Id.* at 188:22-188:23 (emphasis added). The portions of Swanson's testimony highlighted in bold are the portions of Ms. Swanson's testimony selectively quoted in Plaintiffs' Post-Hearing Brief.

[15] During the December 22, 2011 hearing in this case, Plaintiffs' counsel alleged that 50% of the PBs' performance evaluations "involved them getting out and generating new business." (Transcript of December 22, 2011 hearing, Doc. No. 49, at 7:14-7:15, 7:24-8:1.) But there is no evidenced to support this allegation. While it is true that 50% of the PBs' performance evaluations are based on the number of "solutions" (*i.e.*, accounts or credit cards they open, for example), Wells Fargo does not require that PBs leave the branch to obtain those solutions. (*See infra*, note 20 and accompanying text.) Moreover, as Mr. DeBesse testified, PBs solicit and obtain new business in a variety of ways: "New customers can be generated through lead lists, they can be generated through walk-in customers, check-cashing customers that are referred from our teller line, existing customers sending referrals over or -- or giving our bankers referrals of friends, families, coworkers, acquaintances … [w]e may have a business owner that has employees that may need accounts … [t]hat could be generated in a myriad of different ways." (DeBesse Dep., Ex. B-2 to Wells Fargo's Response, at 147:25-148:4; 148:9-148:16).

14100641v.5

- Wells Fargo's employee handbook provides that: (1) nonexempt employees are responsible for submitting timely and accurate records of the hours they work; (2) nonexempt employees are entitled to pay for and must report all hours actually worked, even those that exceed their regular schedule or that are not authorized before working them; (3) if employees have any concerns about their compensation, they are supposed to talk with their manager, human resources, and/or use Wells Fargo's dispute resolution procedure; (4) if employees believe that they have been denied compensation for any hours worked (including overtime), they are supposed to call the Wells Fargo Employee Relations hotline; and (5) Wells Fargo has an anti-retaliation policy to protect employees who in good faith report or provide information about a wage and hour complaint.[16]

- Wells Fargo's FLSA training guides provide that: (1) all authorized or unauthorized hours worked by nonexempt employees performing business for Wells Fargo (inside or outside of the branch) must be recorded and the employees must be compensated for them; and (2) managers and supervisors are not permitted to deny unauthorized overtime or permit employees to work off the clock.[17]

- Wells Fargo's managing within the law training provided to managers and supervisors teaches that: (1) nonexempt employees are required to record the actual hours they work and not the hours they are scheduled to work on Click2Staff; and (2) that PBs must be paid for offsite marketing activities.[18]

- Wells Fargo's Webtime and Time Tracker time recording systems both require employees to certify that their timesheets are accurate and reflect all hours worked.[19]

Plaintiffs also ignore DeBesse's testimony that many PBs are successful without ever leaving the banks.[20]   Further, Plaintiff Byron Young testified he never performed

---

[16] See Ex. C-2 to Wells Fargo's Response, at WF 000828 – WF 000834.

[17] See Ex. C-3 to Wells Fargo's Response, at WF 001233.

[18] See Ex. C-4 to Wells Fargo's Response, at WF 001027 – WF 001028. ("Team Members are required to record their hours as they start — 8:35 or 4:40 versus the hours they are scheduled in Click2Staff.").

[19] See Exs. D-3 and D-4 to Wells Fargo's Response, at WF 003293, WF 003813.

[20] See Wells Fargo's Response at note 25 and accompanying text; see also Deposition of Tom DeBesse, Ex. B-2 to Wells Fargo's Response, at 188:16-189:17 ("A: It is not a requirement that the bankers do every one of these things, no. Q: (BY MS. WILLS) So you disagree with the job description here? MR. SHARDONOFSKY: Objection. Argumentative. A: No, I don't disagree with the job description.  I don't. Q: (BY MS. WILLS) Well, the job description says that: While most of the job is performed in the stores, that Bankers are to reach out into the community by placing outbound calls to existing clients, visiting businesses, conducting educational seminars, and

any offsite marketing work for Wells Fargo, and various PBs in Houston and New York City also testified that they were not required to perform offsite marketing activities.[21]

**D.    Wells Fargo's Varied Use of Prepopulated Timecards Prior to 2010 Does Not Support Conditional Certification.**

In support of the Section 216(b) motion, Plaintiffs attempt to rely on Wells Fargo's varied and inconsistent practice of prepopulating timecards with their weekly staffing schedules.  This argument fails for several reasons.

**Wells Fargo did away with prepopulated timecards in January 2010.**  First, Wells Fargo stopped prepopulating employee timecards in January 2010.[22]  As a result, none of the opt-in plaintiffs—including Jim Akasala, Byron Young, David Fernandez,

---

being active in the community, correct? A: <u>No, that's not what it says. It doesn't say, '….Bankers are to…'</u> It says, '….Bankers reach out into the community by placing outbound phone calls to existing clients, visiting businesses, conducting educational seminars and being active in the community.' Q: Okay. A: <u>It doesn't say there's a requirement that they do every one of those things.</u>") (emphasis added).

[21] The following examples are illustrative:

- David Lara, a PB in the Houston, Texas area, has never participated in an offsite.  (Lara Decl., Ex. E-29 to Response, ¶ 8).

- Ralph Valdez, a former PB from the Houston area, stated that "[w]hen I worked as a PB at the Woodridge location, I was not required to and I did not participate in any offsite marketing events."  (Valdez Decl., Ex. E-31 to Response, ¶ 7).

- Krystal Mariscal-Montoya, another PB in the Houston area, has never participated in an offsite—or any other type of marketing for Wells Fargo.  (Mariscal-Montoya Decl., Ex. E-30 to Response, ¶ 10).

- Josh Berengut, a PB in New York City, said it is uncommon for PBs at his branch to leave the branch to perform marketing activities.  He said "I recall doing one offsite marketing activity at Hunter College during normal business hours.  I was paid for all the time I spent participating in this event."  (Berengut Decl., Ex. E-18 to Response, ¶ 12).

- Desmond Perry, another New York City PB, likewise is not required to participate in marketing activities. He said "[d]uring my tenure as a PB, I have only participated in one offsite marketing event when I went to a city parade as a representative of Wells Fargo."  (Perry Decl., Ex. E-19 to Response, ¶ 10).

[22] *See* Swanson Dep., Ex. B-1 to Wells Fargo's Response, at 148:17-149:7.  Although Plaintiffs emphasize in their brief that "the tool to pre-populate timesheets still exits," they again misconstrue Swanson's testimony.  (Post-Hearing Brief at 6, n.4).  Swanson testified that the Click2Staff scheduling tool is still in use, but that Click2Staff is no longer used to prepopulate employees timecards.  *See* Swanson Dep., Ex. B-1 to Wells Fargo's Response, at 150:24-151:4.

14100641v.5

Joseph Scutts, Ryan Switzer, Karvet Samuels, Jon Racow, and LaDonna McNeill—had their timecards prepopulated in any Wells Fargo timekeeping system.[23]  In addition, prior to January of 2010, not all employee schedules were pre-populated into Webtime.[24]  Instead, this practice varied depending on the store location and the preference of the store's manager.[25]  If an employee's schedule was not prepopulated into Webtime, he or she manually entered all hours worked.[26]

**PBs were required to record their actual hours worked, regardless of the staffing schedules**.  Second, Wells Fargo's timekeeping policy required PBs to record their actual hours worked—even if their schedules were prepopulated into Webtime.[27]  In other words, Wells Fargo required PBs to make the common-sense distinction between their Click2Staff schedules (which were used for staffing purposes) and their daily time entries (used for payroll purposes).  Thus, if a PB's timecard was prepopulated, before submitting the timecard to payroll for processing, the employee was required to affirm that his or her timecard was correct and that it accurately reflected the PB's hours worked.[28]  The following dialogue box appeared on Webtime requiring each PB to confirm that his or her time entries were accurate:

---

[23] *See* Supplemental Declaration of Teresa Swanson ("Swanson Supp. Dec."), attached hereto as Exhibit C, ¶ ¶7-8.

[24] Declaration of Teresa Swanson ("Swanson Dec."), Ex. D to Wells Fargo's Response, ¶ 10.

[25] *Id*.

[26] *Id*.

[27] *See* Swanson Dep., Ex. B-1 to Wells Fargo's Response, at 149:8-12, 150:23-151:17.

[28] *See* Swanson Dec., Ex. D to Wells Fargo's Response, ¶¶ 11-12; *see also* Webtime Timesheet Verification Screen Shot, Ex. D-3 to Wells Fargo's Response.



**PBs were not required to obtain pre-approval to manually alter their timecards.** Third, Plaintiffs argue incorrectly that PBs were required to obtain manager approval to alter or complete their electronic timecards if their time entries differed from their prepopulated timecards. (*See* Post-Hearing Brief at 4.)[29]  Rather, PBs were (and are) required to obtain pre-approval before working overtime; however, this has nothing to do with the PBs' ability to manually alter their timecards and enter their actual hours worked.[30]  PBs were free and were required to alter their timecards as needed in order to accurately reflect their time worked.  Courts repeatedly have endorsed similar timekeeping systems, holding that their use is perfectly lawful under the FLSA.[31]  Thus,

---

[29] Plaintiffs unfairly suggest that Swanson's deposition shows that Wells Fargo knew employees were not making adjustments to pre-populated timesheets.  *See* Doc. No. 47 at 4-5.  In fact, however, Swanson testified as follows: "We stopped taking the feed [used to pre-populate timesheets] because we did not feel that team members were always taking a look at their schedule and making the appropriate changes to it to reflect the accurate time. We require that all team members report to the minute their time."  *See* Swanson Dep., Ex. B-1 to Wells Fargo's Response, at 150:24-151:4 .

[30] *See* Ex. C, Swanson Supp. Dec., ¶ 5.  During the December 22, 2011 hearing, Plaintiffs' counsel claimed that the use of the prepolutated timecards essentially forced the Plaintiffs to perform opening and closing procedures off the clock. (Transcript of December 22, 2011 hearing, Doc. No. 49, at 4:14-4:25.)  But the evidence on record refutes this allegation.  As Wells Fargo noted in its Response, between January 2009 and June 2009, Richardson clocked-out after his bank closed on approximately <u>75</u> days, typically at 6:05 p.m. or 6:10 p.m., but sometimes as late as 8:00 p.m.  (*See* Wells Fargo's Response at note 33.)  Likewise, Plaintiff David Fernandez testified that his supervisors at Wells Fargo sometimes scheduled him to start his shift before the bank opened and that gave him "plenty of time … to conduct opening procedures." (*See* Wells Fargo's Response at note 34.)

[31] *See, e.g., Frye v. Baptist Mem. Hosp., Inc.*, No. 07-2708, 2011 U.S. Dist. LEXIS 45605, at *27 (W.D. Tenn. Apr. 27, 2011) (finding that employer did not violate the FLSA when it ensured employees were paid for all time worked by using "exception logs," on which employees were supposed to record hours they worked outside of their scheduled shifts); *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 169 (W.D.N.Y. 2007) (finding no FLSA violation

Plaintiffs' argument regarding the prepopulated timecards fails to establish a common, unlawful policy or practice sufficient to warrant conditional certification.

**E.      The Call Center Cases Cited By Plaintiffs Do Not Support Conditional Certification Here.**

Plaintiffs cite seven cases in their Post-Hearing Brief for the proposition that "[f]ederal district courts have routinely granted conditional certification to workers alleging similar off-the-clock FLSA violations." (Post-Hearing Brief at 9-10.) But these cases are not in any respect "similar" to the present case. In fact, all seven cases involve claims by customer service employees who worked at various call centers across the country.[32] These employees presented a straightforward claim that was indeed uniform among all employees nationwide: specifically, these employees claimed that they were paid only for their time when they were actually on the telephone or logged onto the computer system; yet they were required to perform various tasks (such as logging on and off their computers and opening certain computer software) each day before and after taking calls.[33] As discussed in detail below, these call center cases bear no resemblance to the allegations at issue in this case and therefore do not support Plaintiffs' claims.

---

when plaintiffs had the authority to manually correct their own time records to reflect this work, and did so on a regular basis); *Tracy v. Dean Witter Reynolds, Inc.*, 185 F.R.D. 303, 313 (D. Colo. 1998) (finding the defendant complied with the FLSA because the evidence demonstrated that "the Payroll Department for Dean Witter acts in compliance with this policy by paying for overtime hours, whether pre-approved or not, when it receives a Time and Absentee Report which has been properly completed by either a supervisor or employee").

[32] Out of the seven bullet-point case summaries in Plaintiffs' Post-Hearing Brief, only one refers to the fact that the plaintiffs were "call center employees." The remaining summaries—as well as that entire section of Plaintiffs' Post-Hearing Brief—omit this critical fact. And Plaintiffs' case summaries also fail to explain that the timekeeping systems used by the defendants in these cases automatically tracked the employees' hours worked only when they were on the telephone.

[33] Unlike the other cases, the timekeeping system involved in *Sharpe v. APAC Customer Service* was independent from the telephone system. *See Sharpe*, No. 09-cv-329-bbc, 2010 U.S. Dist. LEXIS 1671, at *6-9 (W.D. Wis. Jan.

15

- In *Bishop v. AT&T Corp.*, 256 F.R.D. 503 (W.D. Pa. 2009), the plaintiff worked as a customer service representative at a call center in Pittsburgh, PA. The defendant operated call centers in six other states. *Id.* at 505. The plaintiffs submitted evidence—including declarations of 45 call center employees from Pennsylvania, Texas, Missouri, and Massachusetts—showing that call center employees were required to log onto and open up several computer software applications before their shifts began and were required to log off their computers at the end of their shifts. And it was undisputed that they were only paid for the time they were actually logged onto the call system. *Id.* at 505-06 & n.4. There was also evidence that since the filing of the lawsuit, AT&T changed its policies to prohibit employees from logging onto their computers prior to the beginning of their shifts. *Id.* at 505.

- In *Fisher v. Michigan Bell Telphone Co.*, 665 F. Supp. 2d 819 (E.D. Mich. 2009), the plaintiffs sought to certify a collective action involving call center employees in five call centers all located in Michigan. *Id.* at 821. At the conditional certification stage, the case involved <u>104 opt-ins</u> who were working or had worked at all five call center locations. *Id.* at 822. The plaintiffs submitted 67 declarations in support of conditional certification in which they uniformly testified that they were required to arrive early and log onto the computer phone system and have certain software applications open before their shifts. *Id.* at 823. The plaintiffs also claimed that they were not paid for work they allegedly performed during their lunch breaks, including finishing notes and reading company emails. *Id.* They also claimed that they were routinely not paid for their last call of the day pursuant to the company's "rounding" policy, which did not pay them for a call that extended less than seven minutes past the end of their scheduled shift. *Id.* There was evidence that the plaintiffs were not told they were supposed to record their pre- and post- shift activities such as logging in and out of the computer system or finishing up calls that lasted less than seven minutes. *Id.* at 823-24. And like other call center cases cited by Plaintiffs, the defendant changed its policies after learning of this lawsuit. *Id.* at 824.[34]

---

11, 2010). It was undisputed, however, that the company had a policy requiring employees' time entries to be "nearly equal the amount of time he or she is logged into the telephone system" and that another stated policy required employees to have "only a 0.5 percent variance between employees' [timekeeping] entries and their scheduled work hours." *Id.* at *16. These two policies effectively limited the plaintiffs' recorded work hours to the time they spent on the telephone, even though the plaintiffs uniformly alleged they were required to perform certain discrete tasks each day before answering calls, including (1) booting up their computers; (2) logging onto defendant's network; (3) opening various computer programs; (4) reviewing notices on defendant's intranet; (5) completing and correcting customer orders; and (6) completing other administrative tasks. *Id.* at *10.

[34] The district court in *Fisher* also noted that a "vast majority" of the courts that have considered off-the-clock cases involving call center employees have "routinely granted conditional certification." *Fisher*, 665 F. Supp. 2d at 826 (E.D. Mich. 2009). Yet this results from the vast similarity in the factual and legal allegations involved in call

16

- In *Burch v. Qwest Communications Int'l, Inc.*, 500 F. Supp. 2d 1181 (D. Minn. 2007), various consumer call center employees claimed they were required to perform a standard set of job duties (including logging on and off the telephone system and checking email) without compensation before and after their shifts and during their lunch breaks. *Id*. at 1182-83, 1187. It was undisputed that the plaintiffs and the putative class members were all required to perform these duties and that the company's timekeeping system only tracked time that the employees actually spent on the telephone. *Id*. at 1187. The plaintiffs submitted 19 declarations from call center employees in five different states confirming these allegations. *Id*.[35]

- In *Heaps v. Safelite Solutions, LLC*, No. 2:10-CV-729, 2011 U.S. Dist. LEXIS 40089 (S.D. Ohio Apr. 5, 2010), the defendant operated three call centers—two in Ohio and one in Arizona. *Id*. at *1-2. The three named plaintiffs worked as Customer Service Representatives (CSRs) in a call center located in Columbus, Ohio. *Id*. at *2. The plaintiffs claimed they were owed wages for time spent booting up their computers, shutting down their computers, and time spent during lunch and rest breaks participating in online training. *Id*. at *3-4. In support of these claims, the plaintiffs submitted declarations from two of the named plaintiffs and three other Safelite employees. *Id*. at *6. The declarations alleged that the company failed to pay CSRs for boot-up and shut-down time and trained CSRs to begin and end their shifts in this manner. *Id*. at *6-7. In addition, the declarations revealed that the company changed this practice after the lawsuit was filed. *Id*. at *7. The declarations also showed that all CSRs uniformly had to boot up and shut down their computers off the clock because the timekeeping system only recorded time that the SCRs spent logged into the telephone system. *Id*. at *8.

---

center cases. But the call center cases have limited application in other contexts, including this case, where the plaintiffs are not required to log onto a phone system that automatically keeps track of their time and are not required to perform regular tasks without compensation.

[35] Plaintiffs failed to alert the Court that the *Burch* court ultimately decertified the plaintiffs' claims regarding allegations of uncompensated work during meal breaks or work before and after their shifts that were unrelated to booting up and shutting down their computers. The court found that those claims varied significantly among the class members and also varied by location, and thus made a collective action unmanageable. *See Burch v. Qwest Communications Int'l, Inc.*, 677 F. Supp. 2d 1101, 1123 (D. Minn. 2009) (describing those claims as "FLSA violations based on the hodgepodge of other uncompensated activities are not a cohesive group of Plaintiffs with a common set of claims that would be conductive to a collective action"). The *Burch* court, however, did deny the defendant's motion to decertify the claims based on uncompensated time spent booting up and logging onto their computers, or shutting off their computers because there was evidence that this practice was "widespread and uniform"—and were the "allegations that were at the heart of the Court's original conditional certification Order." *Id*. at 1122.

17

- The other call center cases cited by Plaintiffs all involve substantially identical allegations as the cases described above.[36]

In stark contrast to the allegations and evidence presented in these cases, is the utter absence of any claim presented by Plaintiffs in which common issues predominate over individual ones.  Plaintiffs present no evidence of any nationwide (or even widespread) unlawful policy common to all PBs.  For example, here there is no timekeeping system that automatically tracks hours worked based only on the employees' time on the telephone or computer system.  And unlike the call center cases, there is no evidence here that Wells Fargo had or has a nationwide policy requiring PBs to perform regular uncompensated tasks before or after their shifts or during their lunch breaks.  Instead, some Plaintiffs acknowledge they were paid for opening procedures; some acknowledge they were paid for after-hour "calls nights;" and others (like Byron Young) concede that they did not perform marketing activities off the clock.[37]  Moreover, in *Bishop* and *Fisher*, the plaintiffs submitted 45 and 67 declarations, respectively, and in *Fisher*, 100 plaintiffs opted-into the case.  Here, however, Plaintiffs have submitted only five identical, conclusory declarations which materially contradict their deposition

---

[36] *See Garrett v. Sitel Operating Corp.*, No. 10-cv-2900-STA-cgc, 201 U.S. Dist. LEXIS 133846, at *2-5 & n.2 (W.D. Tenn. Nov. 18, 2011) (another call center case in which Customer Service Representatives claimed they were owed overtime for time spent booting up and shutting down their computers, as well as for time logging on and off computer programs before and after their shifts; they sought to certify employees who worked in only <u>one</u> location in Memphis, Tennessee; and they claimed that the timekeeping system did not record their required pre- and post-shift work because it only recorded the time during which they were ready to receive calls); *Russell v. Illinois Bell Tele. Co.*, 575 F. Supp. 2d 930, 932-35 (N.D. Ill. 2008) (another call center case in which the plaintiffs claimed time for logging on and off computer programs before and after their shifts and were also required to perform work during their lunch breaks; again, the company calculated the plaintiffs' pay on the basis of their time spent on the phone system; at the conditional certification stage, approximately 37 plaintiffs had joined the case; the court conditionally certified the case involving 4 locations in Illinois).

[37] *See* Exhibit I-1 attached to Wells Fargo's Response (summarizing and comparing the Plaintiffs' deposition testimony and declarations on a number of relevant topics).

testimony.[38]  Thus, instead of supporting Plaintiffs' claims, the call center cases support

the proposition that conditional certification is not appropriate in this case.[39]

### CONCLUSION

For the reasons set forth above and the reasons outlined in Wells Fargo's

Response to Plaintiffs' Motion for Conditional Certification, Defendant Wells Fargo

Bank, N.A. respectfully requests that the Court deny Plaintiff's Motion for conditional

certification under Section 216(b).

Respectfully submitted,

/s/ Timothy M. Watson
Timothy M. Watson
State Bar No. 20963575
S.D. Texas ID No. 12953
700 Louisiana Street, Suite 3700
Houston, Texas 77002
(713) 225-2300 – Telephone
(713) 225-2340 – Facsimile
twatson@seyfarth.com

ATTORNEY-IN-CHARGE FOR DEFENDANT
WELLS FARGO BANK, N.A.

---

[38] *See* Wells Fargo's Response at 21-22 and Exhibit I-1 attached to Wells Fargo's Response (summarizing and comparing the Plaintiffs' deposition testimony and declarations on a number of relevant topics)..

[39] *See, e.g., Thompson v. Speedway Superway SuperAmerica LLC*, No. 08-1107 (PJS/RLE), 2008 U.S. Dist. LEXIS 115050, at *27-31 (D. Minn. Aug. 21, 2008) (denying conditional certification and distinguishing the call center *Burch* case because the case at issue did not involve allegations of "identical and regularly-scheduled tasks" that were performed by the putative class members off the clock; instead, like the Plaintiffs' sporadic and varied allegations in this case, the plaintiffs alleged that they "**sometimes** performed gasoline price surveys, and **sometimes** responsed to telephone calls from home, while 'off the clock,' but on an irregular basis.").

19

**OF COUNSEL:**

Esteban Shardonofsky
Texas Bar No. 2405132
S.D. Texas ID No. 615928
Kendra K. Paul
Texas Bar No. 24065889
S.D. Texas ID No. 975496
Rachel M. Hoffer
Texas Bar No. 24065432
S.D. Texas ID No. 1006076
SEYFARTH SHAW LLP
700 Louisiana Street, Suite 3700
Houston, Texas 77002
(713) 225-2300 – Telephone
(713) 225-2340 – Facsimile

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

14100641v.5

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon the counsel of record listed below by the Southern District of Texas ECF system, on the 20th day of January, 2012.

Rhonda H. Wills
WILLS LAW FIRM
1776 Yorktown, Suite 600
Houston, Texas 77056
rwills@rwillslawfirm.com

John M. Padilla
PADILLA, RODRIGUEZ & DE LA GARZA, L.L.P.
1776 Yorktown, Suite 110
Houston, Texas 77056
jpadilla@prdlawfirm.com

/s/ Timothy M. Watson
Timothy M. Watson

21