# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| RAYMOND RICHARDSON, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL CASE NO. 4:11-cv-00738 |
| | § | |
| WELLS FARGO BANK, N.A., | § | |
|     Defendant. | § | |

## <u>MEMORANDUM AND ORDER</u>

This case is before the Court on the Motion for Conditional Certification and Class Notice ("Motion") [Doc. # 36] filed by Plaintiffs.[1]  Defendant timely filed a Response [Doc. # 42], to which Plaintiffs have filed a Reply [Doc. # 45].  The Court heard oral argument on the Motion on December 22, 2011 [Doc. # 39].  Plaintiff filed a Post-Hearing Brief [Doc. # 47] on January 9, 2012 and Defendant

---

[1]      The lawsuit was filed by Plaintiff Raymond Richardson.  Subsequently, LaDonna McNeill, Joseph Scutts, Jim Aksala, Byron Allen Young, David Fernandez, and Ryan Switzer filed Notices of Consent [Docs. ## 11, 13, 14, 19, 23, 35] joining the lawsuit as party plaintiffs.  John Racow and Karvet Samuels also filed Notices of Consent [Docs. ## 29, 40], but Plaintiffs do not list Racow or Samuels among the opt-in plaintiffs in their briefing.  *See* Motion [Doc. # 36], at 6; Reply [Doc. # 45], at 1; Post-Hearing Brief [Doc. # 47], at 1.  In its Response [Doc. # 42], Defendant refers to Raymond Richardson and all eight opt-in plaintiffs as "Plaintiffs."  *See* Resp., at 1 n.1.  For purposes of this Motion, the term "Plaintiffs" refers to the named plaintiff Richardson and all eight opt-in plaintiffs: McNeill, Scutts, Aksala, Young, Fernandez, Switzer, Racow, and Samuels.

Defendant also contends that LaDonna McNeill is not a proper plaintiff because she worked as a "Teller" rather than as a personal banker throughout her employment with Wells Fargo.  *See id.* (citing Def. Ex. C-1, McNeill Employment History).  At this stage, the Court does not address the merits of Defendant's contention.

filed a Sur-Reply [Doc. # 51] on January 20, 2012.  Having reviewed the record and applied governing and persuasive legal authorities, the Court **denies** the Motion.

## I.    <u>BACKGROUND</u>

This is a proposed collective action suit seeking unpaid overtime wages under section 216(b) of the Fair Labor Standards Act ("FLSA").  The FLSA requires employers to pay overtime compensation to non-exempt employees who work more than forty hours per regular workweek.  29 U.S.C. § 207; *see also Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 264 (5th Cir. 2000).  Plaintiffs were employed as "personal bankers" for Defendant Wells Fargo Bank, N.A. ("Wells Fargo").  Personal bankers are non-exempt employees and entitled to overtime pay.[2]

On March 2, 2011, Plaintiffs filed suit [Doc. # 1] alleging that Wells Fargo unlawfully denied personal bankers overtime pay by "promulgat[ing] compensation policies and practices" that require personal bankers "to perform integral and indispensable job activities" "off of the clock."[3]  The parties subsequently engaged in months of discovery on the issue of class certification.

---

[2]    *See* Answer [Doc. # 17], ¶¶ 6.2, 6.3; Pl. Ex. 9, DeBesse Depo. [Doc. # 9], at 185.

[3]    Motion, at 1.

2

On November 14, 2011, Plaintiffs filed the instant Motion, seeking to conditionally certify a class of "all individuals who have worked for Wells Fargo with the job title of personal banker 1, personal banker 2, personal banker, private banker 1, private banker 2 or private banker at any time since March 2, 2008."[4]  In support of their Motion, five Plaintiffs submitted declarations explaining that they worked in five of Wells Fargo's thousands of banking locations nationwide.[5]  Plaintiffs also submitted deposition excerpts, job descriptions, job postings, employee time records, and branch hour information.[6]

Defendant opposes certification on numerous grounds and has submitted, *inter alia*, company handbooks, trainings, deposition excerpts, and declarations by two company representatives and fifty-one Wells Fargo personal bankers.[7]

The Motion has been fully briefed and argued and is now ripe for decision.

---

[4]      *See* Proposed Order [Doc. # 37-15], ¶ 1; *see also* Complaint [Doc. # 1], ¶ 2.2.

[5]      *See* Pl. Exs. 2–5, Declarations, ¶ 2; Pl. Ex. 11, Wells Fargo Fun Facts ("Wells Fargo has . . . over 6,200 banking locations in 39 states and the District of Columbia."). In its Response, Defendant states that Wells Fargo has more than 9,000 branches nationwide.  *See* Resp. at 4.  Raymond Richardson and Switzer worked at branches in or near Houston, Texas.   David Fernandez, Joseph Scutts, and Jim Aksala worked at branches in New York, New York.  Before the Wells Fargo-Wachovia merger in 2010, Fernandez, Scutts, Aksala, Young, and Switzer were "financial specialists" at Wachovia. *See* Pl. Exs. 2–5, Declarations, ¶ 1; Def. Ex. A-3, Young Depo., at 19.  According to the declarants, their duties as Wachovia financial specialists were "very similar" to their duties as Wells Fargo personal bankers.  *See id.*

[6]      *See generally* Pl. Exs. 6–10, 13, 14, 18–30.

[7]      *See generally* Def. Exs. A–E.

3

## II.   <u>LEGAL STANDARD</u>

When considering whether to certify a lawsuit under the FLSA as a collective action, the Court generally uses a "two-step *ad hoc* approach."  *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir. 1995) (citing *Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 465–66 (D.N.J. 1988)), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 800–02 (S.D. Tex. 2010) (Rosenthal, J.).  At the first stage, the "notice stage," the Court decides whether to issue notice to potential class members.  *McKnight*, 756 F. Supp. 2d at 801.  The second stage occurs when discovery is largely complete and the defendant moves to "decertify" the conditionally certified class.  *Id.* at 802.  "Neither stage of certification is an opportunity for the court to assess the merits of the claim by deciding factual disputes or making credibility determinations."  *Id.*

At the notice stage, the Court's decision is generally based on the pleadings, affidavits and other limited evidence.  *Mooney*, 54 F.3d at 1214; *McKnight*, 756 F. Supp. 2d at 801.  For a class to be created under section 216(b), the named plaintiff must make, *inter alia*, a "minimal showing" that putative class members are "similarly situated" to the plaintiff in relevant respects given the claims and defenses asserted.  *McKnight*, 756 F. Supp. 2d at 801; *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001) (citations omitted);

4

*Badgett v. Tex. Taco Cabana, L.P.*, 2006 WL 2934265, *2 (S.D. Tex. 2006) (citing *H & R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999)) ("[T]he plaintiff bears the burden of proof of making a preliminary factual showing that a similarly situated group of potential plaintiffs exist.").

The key consideration is that to be "similarly situated," there must be "substantial allegations that potential members 'were together the victims of a single decision, policy, or plan.'" *McKnight*, 756 F. Supp. 2d at 801 (quotations and citations omitted).  To make this determination, courts generally look to the factual and employment settings of the individual plaintiffs, *see Hardemon v. H & R Block East. Enters.*, 2011 WL 3704746, at *3 (S.D. Fla. Aug. 23, 2011) (citations omitted), and the existence of a common policy or plan affecting the potential plaintiffs.  *See Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930, 937 (N.D. Ill. 2008) (citations omitted) (observing that courts have defined "similarly situated" in various ways, including finding that the potential collective action participants must "perform[ ] the same type of duties as the named plaintiff" or that they "were victims of a common policy or plan that violated the law").  Certification should be denied "'if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice.'"  *McKnight*, 756 F. Supp. 2d at 801 (quoting *England v. New Century Fin. Corp.,* 370 F. Supp. 2d 504, 507 (M.D. La. 2005)).

5

Because the court generally has minimal evidence at the notice stage, courts have observed that the conditional class "determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class" that provides potential class members with notice and the opportunity to opt in. *McKnight*, 756 F. Supp. 2d at 801 (quoting *Mooney*, 54 F.3d at 1214 n.8). Where the parties have conducted substantial discovery in connection with class certification, however, some courts have applied a more exacting level of scrutiny rather than the lenient one typically associated with the notice stage. *See, e.g., Hardemon*, 2011 WL 3704746, at *2 ("The voluminous discovery that the [p]arties have already conducted in connection with class certification in this matter . . . merits a heightened level of scrutiny . . ."); *Basco v. Wal-mart Stores Inc., et al.*, 2004 U.S. Dist. LEXIS 12441, at *13 (E.D. La. 2004) ("[I]n light of the substantial discovery that has occurred in this matter, the Court will consider the criteria for both the first and second steps in deciding whether it should certify this matter."). These courts have made factual determinations to whether the claimants are similarly situated based on the totality of the circumstances. *See Hardemon*, 2011 WL 3704746, at *3 (citations omitted).[8]

---

[8] The Court does not rely on *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) because Rule 23 certification requirements do not apply to FLSA collective actions. *See LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288 (5th Cir. 1975).

6

Because the parties here have conducted several months of discovery on the conditional certification issues, this Court has considered applying a more exacting standard, rather than the "lenient" one advocated by Plaintiffs.[9]  Nevertheless, the Court does not use a heightened burden; the Court evaluates the parties' evidence and argument under the lenient standard typically applied in this circuit.

## III.   <u>DISCUSSION</u>

Plaintiffs claim that they were denied overtime pay for three categories of work: (1) work performed opening and closing branches,[10] (2) work performed during uncompensated lunch breaks,[11] and (3) work performed to generate business and market Defendant's services outside scheduled work hours.[12]

---

[9]   *See* Motion, at 2; Reply, at 4.

[10]   Plaintiffs claim that when personal bankers were scheduled to shifts starting at the same time as their branch's opening hour, they were required to arrive 15 to 30 minutes before their scheduled shift to open the bank.  However, they were not paid for that time. Similarly, Plaintiffs argue that when personal bankers' shifts were scheduled to end at the branch's closing hour, the bankers were required to stay 15 to 30 minutes after their shift to do closing tasks.  As with opening procedures, Plaintiffs claim that they were not paid for this extra time worked.

[11]   Plaintiffs describe this work as handling lunch-time calls and bank traffic, marketing, and other work-related tasks.  *See* Motion, at 20.  According to Plaintiffs, personal bankers were not paid for this time because Defendant automatically deducted a lunch break on its computerized payroll record systems.  *Id.* at 2.

[12]   These duties included making phone calls, visiting prospective and existing customers, participating in marketing events and campaigns, and referring customers to other Wells Fargo departments.  *See* Motion, at 21.  According to Plaintiffs, personal bankers were not paid for this time because Wells Fargo failed to make "compliance

7

Plaintiffs also argue that Defendant has a national policies or practices of (i) denying overtime, as evidenced by its use of a timekeeping system that pre-populated employees' timesheets with scheduled work hours, and (ii) failing to make "compliance efforts to ensure that personal bankers were paid for the time they spent performing marketing duties."[13]

Defendant argues that Plaintiffs have failed to produce meaningful evidence of any official company policy or practice of denying overtime pay. Defendant cites to its official written policy that personal bankers be paid for "all hours worked, including time spent performing offsite marketing activities."[14] Defendant also argues that the resolution of each Plaintiff's claims requires highly individualized inquiries about the circumstances of each individual's alleged off-the-clock work.[15]

---

efforts" to ensure that personal bankers were paid for this work. *See* Post-Hearing Brief, at 4, 6.

[13]    Post-Hearing Brief, at 4, 6.

[14]    *See* Resp., at 10.

[15]    Resp., at 8, 29. Defendant also argues that a collective action is unsuitable based on the 51 declarations by other Wells Fargo personal bankers, *see* Resp. at 23, and the fact that Defendant's potential defenses require highly individualized inquiries about each employee's claims. *See* Resp. at 30. Because the Court finds that Plaintiffs' evidence alone fails to meet its "substantial allegation" burden, the Court need not consider the Defendant's declarations or reach Defendant's other arguments.

8

As detailed below, the Court finds that Plaintiffs have not identified any company-wide, national policy or plan of denying overtime pay.   Plaintiffs accordingly have failed to show its putative class members are "similarly situated" for purposes of conditional certification.

## A.      Job Duties and Claims about Off-the-Clock Work

Although Plaintiffs worked at different bank branches and under the supervision of different individuals, Plaintiffs appear to have performed similar basic job duties.  These duties consisted of providing customer service within bank branches (*e.g.*, opening new accounts, providing ATM and debit cards, taking loan applications, answering customers' questions) and marketing bank products within and outside bank branches (*e.g.*, making calls to existing and potential clients, visiting businesses, conducting seminars in the community).[16]

Plaintiffs' declarations and depositions[17] show that there is substantial overlap in their claims about off-the-clock work they performed.[18]  Plaintiffs have submitted nearly identical declarations that assert that the declarant was denied

---

[16]     *See, e.g.,* Pl. Ex. 13, Personal Banker Job Spotlights; Pl. Ex. 14, Personal Banker Job Postings.

[17]     *See* Pl. Exs. 1–5, Declarations, ¶ 4.

[18]     Of the nine Plaintiffs, three have declarations and depositions: Richardson, Fernandez, Scutts.  One has just a deposition: Young.  Two have just declarations: Switzer, Aksala.  Plaintiffs McNeill, Racow, and Samuels do not have declarations or depositions.

overtime for all three categories of alleged off-the-clock work.  Although Plaintiffs

Richardson, Fernandez, Scutts, and Young's descriptions of their claims in their

depositions do not match exactly the assertions in their respective declarations,

there is sufficient overlap among the four Plaintiffs' testimony to find similarity in

their claims about the three categories of off-the-clock work they performed, at

least from time to time.  For example, Richardson and Scutts both testified that

they were sometimes not paid for lunch-time work.[19]  Richardson, Scutts, and

Fernandez all testified that they were sometimes not paid for marketing work.[20]

Lastly, Richardson, Young, Fernandez, and Scutts all testified that they were

sometimes not paid for opening or closing procedures.[21]  Supplemented by Switzer

---

[19]    *See* Def. Ex. A-1, Richardson Depo., at 54, 65–66 (lunch-time marketing); *id.* at
71 (lunch-time non-marketing work); Def. Ex. A-4, Scutts Depo., at 99, 101–103 (lunch-
time marketing).  It is noted that Scutts' deposition testimony on lunch-time work is
inconsistent and unclear.  He testifies that he was not paid for monthly conference calls
and that such calls took place either "in the morning, midday, or in the evening."  *See*
Def. Ex. A-4, Scutts Depo., at 99, 101–103.  He also testifies that midday conference
calls were around 11 or 11:15 a.m. and that he was typically on the clock during that
time.  *See id.* at 103.  The Court nevertheless gives Scutts' testimony the benefit of doubt
and, for purposes of this Motion, assumes that at least some "midday" conference calls
may have been at "lunchtime" and unpaid.

[20]    *See* Def. Ex. A-1, Richardson Depo., at 54, 65–66 (lunch-time marketing); *id.* at
54, 71, 78, 148 (after-hours marketing); Def. Ex. A-4, Scutts Depo., at 99, 101–103
(lunch-time marketing); Def. Ex. A-2, Fernandez Depo., at 93–94, 109, 115 (before and
after-hours marketing).

[21]    *See* Def. Ex. A-1, Richardson Depo., at 54, 114 (opening procedures); Def. Ex. A-
3, Young Depo., at 27 (opening procedures); Def. Ex. A-2, Fernandez Depo., at 15, 85,
101–103, 121 (opening and closing procedures); Def. Ex. A-4, Scutts Depo., at 99
(opening procedures).  It is noted that Richardson testifies at one point that he was not

10

and Aksala's declarations, which state that they were denied overtime for all three categories of alleged off-the-clock work, Plaintiffs have produced sufficient evidence that plaintiffs have similar claims about off-the-clock work. [22]

### B.     Lack of Nationwide Decision, Policy or Plan

Plaintiffs' request for certification of a collective action falls on the second aspect of the analysis of whether they are "similarly situated."  Plaintiffs have not produced evidence that Defendant has had in the past or now has a national, company-wide decision, policy, or plan to deny personal bankers overtime pay.  In fact, Defendant has a written policy that requires employees to accurately report all hours worked.   Its employee handbook, for example, directs non-exempt

---

paid for opening procedures, *see* Def. Ex. A-1, Richardson Depo., at 54, but later states he is not sure if he was paid or not paid for opening procedures.  *See id.* at 114.  The Court gives Richardson the benefit of doubt and, for purposes of this Motion, construed his testimony to be that he was sometimes not paid for opening procedures.

[22]     At the notice stage, the Court does not evaluate the credibility of the Plaintiff's evidence.  The Court, however, has not considered any statements in declarations that are plainly contradicted by the witness's prior deposition testimony.  For example, Young could not recall during his deposition being denied overtime for closing procedures, working during lunch breaks, or marketing when he was asked whether he did "any other" uncompensated work for Wells Fargo.  *See* Def. Ex. A-3, Young Depo., at 27, 36, 40.  Fernandez did not mention doing any unpaid lunch-time marketing even though he did remember doing unpaid marketing before and after his shifts.  *See* Fernandez Depo., at 109, 115.  Plaintiff has not cited to any deposition testimony about Fernandez doing other unpaid lunch-time work.  *See* Motion, at 20–21.  Scutts did not mention that he was not paid for closing the bank even though he was asked about the scope of activities for which he was not paid.  *See* Def. Ex. A-4, Scutts Depo., at 100.  To the extent that these Plaintiffs stated they could not recall or did not mention particular off-the-clock activities when so asked during depositions, the Court rejects Plaintiffs' statements in their declarations asserting lack of payment for those activities.

11

employees to take lunch breaks and to record times that they work during their lunch break.[23]   The Handbook also instructs, "[Y]ou are entitled to pay for all hours actually worked, even those that exceed your regular schedule or that are not authorized before working then."[24]   Wells Fargo also prohibits managers from working employees off the clock[25] and trains its managers that time worked before and after scheduled hours must also be reported.[26]

Although written policies are not dispositive that an actual plan or practice exists, *see Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930, 935 (N.D. Ill. 2008) (citing *Burch v. Quest Commc'ns Int'l., Inc.*, 500 F. Supp. 2d 1181, 1188 (D. Minn. 2007)) ("[T]he mere fact that a company has a written overtime policy does not defeat conditional certification when a plaintiff provides countervailing

---

[23]    *See* Def. Ex. C-2, Wells Fargo 2011 Team Member Handbook, at WF000828 ("If you're a nonexempt team member, you must take the required meal period to which you're entitled during the workday . . . . Meal periods are considered unpaid time. If for any reason, on occasion, your supervisor requires you to work or stay at your workstation during your meal period, it's considered paid time and should be recorded as work time.").

[24]    *See id.*

[25]    *See* Def. Ex. C-3, Excepts of Wells Fargo 2011 FLSA Training Guide, at WF001233 (emphasis in the original) ("To comply with Wells Fargo's overtime policy, managers will not: . . . Deny overtime pay to a team member, even if the overtime was unauthorized [or] Require or allow team members to work extra hours off the clock.").

[26]    *See* Def. Ex. C-4, Experts from Wells Fargo "Managing Within The Law" Training Guide (May 4, 2010), at WF001028 ("Team Members are required to record their hours as they start—8:35 or 4:40 versus the hours they are scheduled in Click2Staff.").

12

evidence of a common policy of not paying for overtime."), written policies are relevant considerations when assessing workers' arguments about the existence of a company-wide policy. *See Burch*, 500 F. Supp. at 1188 (noting that a written policy dictating overtime pay can be a factor weighing against conditional certification). Defendant Wells Fargo has clear written policies mandating accurate recordkeeping of employee's time and payment of overtime when worked outside scheduled shifts or during lunch time.

Plaintiffs counter that Wells Fargo's job descriptions and postings are evidence of a national policy or plan.[27] The Court is unpersuaded. These job descriptions and postings identify a variety of job duties held by personal bankers.[28] Nowhere do these documents state that these duties are to be performed without compensation if done outside an employee's regular, assigned shift hours.

Plaintiffs also cite published bank branch hours for "8–6 p.m. Monday–Friday"[29] and time sheet entries for "8:00 a.m." or "6:00 p.m." as evidence that personal bankers were required to perform opening or closing procedures outside of branch hours, but were denied overtime pay for that work. Plaintiffs fail,

---

[27]    Motion, at 19.

[28]    *See* Pl. Ex. 13, Personal Banker Job Spotlights; Pl. Ex. 14, Personal Banker Job Postings.

[29]    *See* Motion, at 18–20.

however, to cite any testimony showing that a particular Plaintiff actually opened or closed branches before or after hours on any specific dates in contradiction of their time entries.

Of key significance, most Plaintiffs provide no evidence that their supervisors actually told them that they must perform work off-the-clock, nor do most Plaintiffs provide proof of any rejected request for overtime pay for the tasks in issue.   Plaintiffs' declarations and depositions establish that most Plaintiffs *believed* that they had to work off-the-clock in certain respects.  Plaintiffs testified, for example, that "it was understood" that personal bankers would record only their scheduled time rather than all hours worked.[30]   Only Scutts and Richardson testified that one or more of their various Wells Fargo managers explicitly told him to work off-the-clock.[31]   No other Plaintiff or declarant explained how they

---

[30]    Young testifies, for example, "that's just the way it was done. That was my understanding" that one was not paid for opening procedures.  *See* Def. Ex. A-3, Young Depo., at 37.

[31]    *See* Def. Ex. A-4, Scutts Depo., at 56–64, 66–74.  It appears that Scutts had at least three Wells Fargo "district managers": Rosanna Paniccia, *id.* at 62; Jeff Mercado, *id.*; and Angelo Moultair, *id.* at 57, 67.  He testified that according to Moultair, "It was mandatory for me to attend [marketing meetings]," but "I would only be paid for my hours of that day."  *See id.* at 67–68.  Scutts also testified that he and Paniccia had conversations about how "[h]e had to be at marketing meetings until late in the night every month," but he was not paid for those hours.  *See id.* at 66–68.  Richardson reported someone who told him that he needed to market on his own time, but could not recall who said this.  *See* Def. Ex. A-1, Richardson Depo., at 100.  Neither Richardson nor Fernandez remembers seeing any written policy requiring off-the-clock marketing work.  *See* Def. Ex. A-1, Richardson Depo., at 76; Fernandez Depo., at 115, 118.

14

developed their beliefs that time spent opening and closing the branch, working during lunch breaks, or marketing for the bank could not be logged or compensated upon request.  The fact that three or four managers allegedly required or condoned off-the-clock work is insufficient to warrant the complex, enormous, nationwide class that Plaintiffs request.  It is clear that resolution of each Plaintiff's claim will require individualized inquiries about his or her specific managers' policies and practices.  *See Castle v. Wells Fargo Fin., Inc.*, 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008) (citing *Hinojos v. The Home Depot, Inc.*, No. 2:06-CV-00108, 2006 WL 3712944, *3 (D. Nev. Dec.1, 2006)).

Furthermore, Plaintiffs' own depositions reveal that some managers had no knowledge and others had little knowledge about subordinates' alleged off-the-clock work activities.  Not only have most Plaintiffs failed to demonstrate their supervisors refused to permit overtime pay upon request, Plaintiffs have not shown they expressly made such requests.[32]  The Court agrees with and adopts the

---

[32]     For example, Richardson testified that he told managers that he was marketing during lunch time, but does not recall telling his managers that those times were unrecorded.  Def. Ex. A-1, Richardson Depo., at 98–99, 145.  Young could not recall whether he talked to his managers about not getting paid for opening procedures, *see* Def. Ex. A-3, Young Depo., at 37, and if he did tell someone, he could not remember whom he told, *see id.* at 38.  Fernandez could not recall whether he told any of his managers about his unpaid marketing work.  *See* Def. Ex. A-2, Fernandez Depo., at 116–17, 130.  As noted above, only Scutts identified specific managers who said marketing work needed to be done off-the clock.

reasoning in *Jost v. Commonwealth Land Title Ins. Co.*: Where the "inappropriate behavior rested on the interpretation and implementation" of regional managers and "there is no evidence that managers, nationwide, failed to follow [written overtime] policies," nationwide certification is inappropriate.   No. 4:08-cv-734, 2009 WL 211943, at *4 (E.D. Mo. Jan. 27, 2009) (citations omitted).[33]

It should also be noted that several Plaintiffs did not work for Wells Fargo during the proposed class period.  Before the Wells Fargo-Wachovia merger in 2010, Fernandez, Aksala, Scutts, Young, and Switzer were "financial specialists" at Wachovia.[34]   These Plaintiffs' testimony or declarations regarding alleged unpaid overtime work for Wachovia is not relevant to whether Wells Fargo had a nationwide policy, plan, or decision denying overtime pay for these alleged categories of work during the proposed class period.

To prove a company-wide national policy, Plaintiffs also rely on personal bankers' alleged difficulty of finishing all their assigned duties within a forty-hour

---

[33]     Plaintiff also points out that there are two FLSA lawsuits against Wells Fargo in California and Florida involving claims by personal bankers for overtime.  *See* Post-Hearing Brief, at 2.  Although the allegations of off-the-clock work in those cases appear to encompass the same three categories of off-the-clock work alleged in this case, mere allegations alone are insufficient to establish the existence of national policy or plan.

[34]     *See* Pl. Exs. 2–5, Declarations, ¶ 1; Def. Ex. A-3, Young Depo., at 19.

workweek[35] and managers' alleged awareness that employees worked unlogged hours. Subjective beliefs or fear about logging overtime hours is insufficient to establish an actual company-wide policy. *See Brooks v. BellSouth Telecomm., Inc.*, No. 07-cv-3054, 2009 U.S. Dist. LEXIS 20552, at \*30 (N.D. Ga. Feb. 10, 2009).[36]

In addition, Plaintiffs rely heavily on Defendant's use of two unified computer timekeeping programs, Webtime and Time Tracker.[37] Personal bankers nationwide used that system, which tracked the employees' time with their input. From 2008[38] through 2010, the bank apparently used a system called "Webtime." In January 2011, it switched to "Time Tracker."[39] Under both systems, employees

---

[35]    Plaintiffs argue that the job duties for personal bankers "cannot reasonably be performed within the forty hour per week shift for which most personal bankers are scheduled to work." Motion, at 21.

[36]    *See* Resp., at 14 (citing *Brooks*, 2009 U.S. Dist. LEXIS 20552, at \*29–\*30 (concluding that the fact that some plaintiffs feared being disciplined for submitting "exceptions" to log overtime was not evidence of class-wide FLSA violations; the most that the plaintiff's evidence showed "is that a few supervisors may have failed to follow company policy")).

[37]    Pl. Ex. 9, Def. Ex. B-2, DeBesse Depo., at 102–103.

[38]    DeBesse could not recall which system Wells Fargo used in 2008: "[I]t could very well have been Webtime or it could have been another system that tracked time . . . My testimony is, in March 2008, the time tracking system could very well have been Webtime." *See* Def. Ex. B-2, DeBesse Depo., at 100. Plaintiffs have not cited any evidence of what timekeeping system Wachovia used before or after the Wells Fargo-Wachovia merger.

[39]    *See* Resp., at 5; Pl. Ex. 12, Time Tracker Discussion Guide (explaining that Wells Fargo "will be transitioning to Time Tracker beginning Sunday, January 2, 2011").

17

were able to input or edit the hours that they worked before submitting the time records.[40]  Plaintiffs have not established, however, that all putative Plaintiffs' time cards or other personal bankers' time records were "pre-populated" with scheduled work hours in the same ways.  Prior to January 2010, Webtime apparently received a feed of employees' scheduled hours ("Click2Staff"), but only for those employees whose managers submitted scheduled hours by a weekly deadline.[41] This feed pre-populated a week's scheduled hours into Webtime, but employees could manually change the entries before submitting each week's records to management.[42]  If a manager did not meet the weekly "feed" deadline, Webtime did not pick up the scheduled hours for that managers' employees, and those employees' time records were not pre-populated with scheduled hours.[43]  In this respect, the way in which Plaintiffs' hours were inputted and tracked was not uniform across the country, let alone uniform from branch to branch, or supervisor to supervisor, or week to week.

---

[40]     *See* Def. Ex. B-1, Swanson Depo., at 75 (describing that Webtime had "drop down boxes" and Time Tracker had "free entry"); Pl. Ex. 12, Webtime Team Member Reference Guide, at WF001625; Pl. Ex. 12, Time Tracker Discussion Guide, at WF001591.

[41]     *See* Def. Ex. B-1, Swanson Depo., at 148–50.

[42]     *Id.*

[43]     *See id.* at 150; *see also* Def. Ex. D. Swanson. Decl., ¶ 10.

Thus, Defendant's use of these programs is not probative evidence of a national decision, policy or plan under the circumstances presented.[44]   Moreover, as noted, both Webtime and Time Tracker permitted employees to input or edit the entries to reflect actual hours worked.[45]   The Wells Fargo timekeeping policy required personal bankers to record their actual hours worked,[46] and to affirm that timecards were correct and accurately reflected the personal bankers' hours worked.[47]   The fact that personal bankers were supposed to get pre-approval to work overtime does not mean overtime was barred for work that supervisors believed was necessary.[48]   The allegedly pre-populated timekeeping programs do

---

[44]   It is noted that Defendant eliminated the pre-population of employee timecards in January 2010.  *See* Def. Ex. B-1, Swanson Depo., at 148–149, 150–151; Def. Ex. D, Swanson Decl., ¶ 10.  Thus, opt-in Plaintiffs Fernandez, Akasala, Scutts, Young, and Switzer, none of whom worked for Wells Fargo until after the Wells Fargo-Wachovia merger in 2010, had their timecards pre-populated in any Wells Fargo timekeeping system.

[45]   *See id.*; Def. Ex D, Swanson. Decl., ¶¶ 8–12.

[46]   *See* Def. Ex. B-1, Swanson Depo., at 149, 150-151.

[47]   *See* Def. Ex. D, Swanson Decl., ¶¶ 9, 12; *see also* Def. Ex. D-3, Webtime Timesheet Verification Screen Shot; Def. Ex. D-34, Time Tracker Timesheet Verification Screen Shot.

[48]   *See* Ex. C-2, Wells Fargo 2011 Team Member Handbook ("Overtime affects your business group's plan and budget, so it's important that your manager approves it in advance.  Working unauthorized overtime hours can be grounds for corrective action, which may include termination of your employment.").  Indeed, some Plaintiffs knew that they could change their pre-populated hours.  For instance, Fernandez testified that Webtime allowed him to put in start time and clock out for lunch.  *See* Def. Ex. A-2, Fernandez Depo., at 72.  Scutts acknowledged that he could log his hours, including some hours that occurred before bank branch hours.  *See* Ex. A-4, Scutts Depo., at 124.  The

19

not, under the facts presented, demonstrate the existence of a nationwide decision, plan or policy by Defendant to refuse to permit overtime pay.

Plaintiffs also argue that Defendant did not institute "compliance efforts" to ensure that the overtime policies were enforced by supervisors in thousands of bank branches. This contention is unavailing. Plaintiffs have not demonstrated a need for a compliance program. Most of the Plaintiffs have not even established that they requested overtime pay for work in excess of forty hours per week or that Plaintiffs' requests were denied on a widespread or frequent basis.

In sum, the Court holds that there has been no showing of a single decision, policy or plan by Defendant that warrants certification of a nationwide class of personal bankers for the denial of overtime pay for off-the-clock work in thousands of bank branches under thousands of supervisors over the potential class period, as proposed by Plaintiffs. *See McKnight*, 756 F. Supp. 2d at 801.[49]

Plaintiffs rely heavily on several decisions by courts that granted conditional classes or declined to decertify a class. These cases, however, are materially distinguishable from the facts at bar. Several of the cited cases involved proposed

---

Court does not rely, but does note, that many personal bankers were aware of their ability to change the time entries in the computerized timekeeping systems. *See generally* Def. Exs. E-1–E-51, Declarations.

[49]     Indeed, there has been insufficient proof or even argument of a single decision, policy, or plan covering a smaller number of Defendant's bank branches to warrant collective treatment.

20

classes vastly smaller in size or geographic scope, involved "call centers" that are somewhat unique factually, or had significant evidence of unified policies applied at one single facility or several facilities where many plaintiffs worked—all dissimilar to the evidence at bar. *See, e.g.*, *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 906 (S. D. Tex. 2009) (one facility in Texas); *Fisher v. Mich. Bell Tel. Co.*, 665 F. Supp. 2d 819, 822 (E.D. Mich. 2009) (six call centers in Michigan); *Bishop v. AT&T Corp.*, 256 F.R.D 503, 505 (W.D. Pa. 2009) (call centers in various cities in six states, with proof that the employees were only paid for the time they actually were logged into the telephone call system despite the need to log into other computer software systems to do their jobs).  In other cases, the plaintiffs presented evidence of a clear company-wide policy.  *See, e.g.*, *Sharpe v. APAC Customer Servs. Inc.*, 2010 WL 135168, at *4, *6 (W.D. Wis. Jan. 11, 2010) (defendant call center executive admitted that it had a "national performance goal" of "0.5 percent variance" between hours an employee was logged into the phone system and scheduled work hours, *i.e.*, 2.4 minutes in an eight-hour workday, even though "it takes more than two or three minutes [each day] to log in to all of the necessary computer programs and complete administrative tasks").  Finally, the conclusions in *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 540–541 (S. D. Tex. 2008), are also distinguishable.  The *Falcon* plaintiffs produced evidence that the defendant strongly discouraged overtime by

failing, for example, to increase labor budgets even after reclassifying plaintiffs from "exempt" to "non-exempt" status, despite "anticipat[ing] that [plaintiffs] would continue to work more than 40 hours after the reclassification." *See id.* at 530, 536. Here, Plaintiffs have produced no such powerful evidence.

IV. **CONCLUSION**

For the many foregoing reasons, the Court concludes that Plaintiffs have failed to show that they and the putative collective action plaintiffs were similarly denied overtime pay under a "single decision, policy, or plan" that violated the FLSA. Accordingly, it is hereby

**ORDERED** that Plaintiffs' Motion for Conditional Certification and Class Notice [Doc. # 36] is **DENIED**.

SIGNED at Houston, Texas, this 2nd day of **February, 2012**.

Nancy F. Atlas
United States District Judge

22